Jorge ACOSTA, Petitioner-Appellant,

v.

R. V. TURNER, Superintendent, Glades Correctional Institution, Respondent-Appellee.

No. 80–5095.

United States Court of Appeals, Fifth Circuit.*
Unit B

Feb. 4, 1982.

---

Byron B. Mathews, Jr., Miami, Fla., court appointed, for petitioner-appellant.

James H. Greason, Stephen R. Jacob, Asst. Attys. Gen., Miami, Fla., for respondent-appellee.

Before GODBOLD, Chief Judge, Frank M. JOHNSON, Jr. and ANDERSON, Circuit Judges.

GODBOLD, Chief Judge:

This is an appeal from the district court's dismissal without a hearing of a petition for writ of habeas corpus filed by Acosta, a Florida state prisoner. We reverse because of issues that spring from the handling of the question of Acosta's competency to stand trial.

The record, on the basis of which the district court acted, is confusing and incomplete. In November 1973 police were called when Acosta was seen on a Miami street nude and with bleeding arms. Soon thereafter police found him in a hotel bed with slashed wrists, still alive, and found his girlfriend under the bed strangled to death. Twelve hours later, in a hospital, Acosta confessed to murdering the victim, indicating that he desired to be executed. He was charged with first degree murder. Four days after the confession he was examined by a court-appointed psychiatrist who diagnosed him as suffering from "a chronic schizophrenic illness," as lacking the "capacity to fully comprehend the proceedings against him or to assist counsel in his own defense," and as possibly lacking the ability to understand the "wrongfulness of his actions" or to "conform his behavior to the requirements of the law." Following this doctor's recommendation, Acosta was committed for treatment to a state hospital.

After almost one and one-half years of treatment Acosta was diagnosed on February 11, 1975 as still suffering from "a major mental illness, schizophrenia, paranoid type" but at the time "in remission." Acosta was taking a daily dosage of an antipsychotic drug. He was recommended by the state forensic board for release with follow-up care and was said by the board to be ready to stand trial.[1]

Acosta was released March 3, 1975. The next day the court ordered Jackson Memorial Hospital to examine Acosta. On April 22 the court appointed a Dr. Georgia and Dr. Miguel A. Mora to examine the defendant. The record does not disclose whether any of these three examinations ordered by the court ever took place.

At a pretrial conference on July 9 Acosta's mental capacity to stand trial was discussed. Although Acosta was present, he spoke no English and the trial judge spoke no Spanish. It became clear that the court had intended to appoint Dr. Modesto Mora to examine the defendant and instead had erroneously appointed Dr. Miguel A. Mora. The court ordered Dr. Modesto Mora appointed. At this conference the following colloquy occurred between the court and counsel:

MR. GRAVES: (prosecutor) There is the feeling of the State that the defendant is, at this time, competent to stand trial. I don't know if Mr. Negretti [defense counsel] stipulates to the reports to his competency.

THE COURT: I feel that, after talking with you and Mr. Negretti, that he will stipulate that the defendant is competent to stand trial, at this time. However, I feel it should be put on the record and brought to your attention. If you are not aware, Mr. Graves, that the wrong Doctor Mora was appointed by the Court to evaluate this man. Who the Court had in mind was not

1. His treating physician described his mental condition on February 5 as being "alert, in good contact, speaking coherently and relevantly, well oriented in all three spheres, does not show memory defect, . . . denies hallucinatory experience as well as feelings of depression, [n]o delusions could be elicited, [i]nsight fair, and judgment fair."

appointed. Naturally, he hasn't been evaluated by Dr. Modesto Mora, which I believe was the one that was thought by the Court to be appointed. Another Mora was appointed.

MR. GRAVES: There are plenty reports in the file that are sufficient reports ... for us to stipulate.

MR. NEGRETTI: (defense counsel) We would rather wait for [the correct] Dr. Mora's report and he might come in. The man is not competent to stand trial. [Query whether the proper transcription is: "Dr. Mora's report ... might come in (that) the man is not competent to stand trial."] I will stipulate to the reports as they are right now as to his competency. I don't know, I am not a psychiatrist.

. . . .

I feel my client is competent to stand trial. I don't know what Dr. Mora is going to find, which might be slightly different .... Right now, it's stipulated, my defendant is competent to stand trial upon the reports that we have had ....

THE COURT: Could you stipulate to his competency to stand trial based upon the reports that you have and that Dr. Mora's reports comes in differently? Then, of course, in the matter that we have entered into today would be vacated because that would be in fairness to the defendant.

MR. NEGRETTI: That would be fine, your honor.

. . . .

THE COURT: We will set it down for a waived jury trial in first-degree murder case on 6/23 ....

. . . .

[I]f there is any indication in the report that he is not competent to stand trial, of course, we can vacate those proceedings insanus [sic] [in fairness?] to the defendant.

In his second remark in this colloquy, prosecutor Graves referred to reports in the file sufficient to support a stipulation of competency. As of that date the only reports indicating competency that are revealed by the record before us are the February 1975 reports of the state forensic board and of Acosta's treating psychiatrist pursuant to which Acosta was released from the state hospital. The colloquy discloses an agreement between court and counsel: counsel would stipulate to Acosta's competency to stand trial and the case would proceed without waiting for Dr. Modesto Mora's report; if the report, when it came in, indicated incompetency the trial proceedings would be vacated.

The record does not contain a report by Dr. Modesto Mora nor does it tell whether he ever examined Acosta.

On June 24 Acosta was convicted in a one day trial. The next day, June 25, the trial judge ordered examinations by two more doctors, both previously unmentioned, Drs. Mutter and Castiello, to determine whether Acosta was *competent to undergo sentencing*. Dr. Mutter's report was given August 20, eight weeks after trial, and it diagnosed Acosta as "still suffering from a major mental disorder, ... incapable of understanding the proceedings by virtue of his active psychotic process, ... [and] incapable of assisting his counsel ...."[2] The full report of Dr. Castiello's examination is not in the record. However, in a report given in 1976 Dr. Castiello stated that he had seen Acosta on July 9, 1975, two weeks after the trial, "and at that time the defendant was

2. Dr. Mutter also reported the following:

The patient stated that he has been in court, but did not know if the trial was held or what the findings were. "I don't know what time I will get. They never tell me what the outcome was. I don't know if they found me guilty or not." ... Additional questioning indicated that the patient was actively hallucinating and was delusional .... Mental status examination revealed a very agitated male, who understood my questions but appeared incoherent at times. His affect was inappropriate. He was quite autistic .... There were signs of auditory hallucinations, persecutory delusions with ideas of reference. Thinking was concrete. Judgment and insight were grossly impaired. Diagnostic impression is chronic schizophrenia.

considered psychotic, [and] not competent to stand trial."

Acosta was recommitted to the state institution, presumably on the basis of the Mutter report, where he remained until May 1976 when he was released as competent. He was then sentenced to 50 years imprisonment.

After exhausting his state remedies, Acosta brought this petition for writ of habeas corpus, alleging several constitutional violations. The district court denied habeas. We reverse on the ground that adequate procedural steps were not taken by the state trial court to ensure Acosta's competency to stand trial.

### I. The pretrial agreement by the trial court

Acosta's contentions before the district court relevant to his competency to stand trial focus primarily on *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), which requires the trial court under certain circumstances to inquire *sua sponte* into a defendant's mental condition. This matter is addressed in part II below, where we ultimately remand the case to the district court. Before we take up the *Pate* issues, however, we observe that there is another matter that might dispose of this case on remand without requiring the complex *Pate* remedial procedures.

A conditional agreement was entered into between court and counsel at the pretrial conference under which defense counsel stipulated to Acosta's competency and the case proceeded to trial without waiting for the correct Dr. Mora's report. The trial court was required to keep its end of the bargain made. Analogous precedent is found in the area of plea bargaining. If a defendant is induced to plead guilty by a promise of some performance by the prosecution, the defendant has a constitutional right to specific performance of the bar-

gain. *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). This right adheres regardless of whether the omission by the state is inadvertent or appears to be harmless. *Id.* at 262, 92 S.Ct. at 498–99. The right to enforcement of a plea bargain promise arises because "this phase of the process of criminal justice ... must be attended by safeguards to insure the defendant what is reasonably due in the circumstances." *Id.* The competency of a criminal defendant to stand trial is of such fundamental importance to our criminal justice system that "safeguards to insure the defendant what is reasonably due" are required. This is the rationale of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) and successor cases concerning competency to stand trial. Proper administration of criminal justice and principles of due process therefore require no less adherence to the state's agreements in this context than in the area of guilty pleas.

The trial judge agreed to vacate the proceedings if Dr. Modesto Mora's report gave "any indication" that Acosta was incompetent.[3] The record does not contain a Mora report and so this issue must be developed and considered in the district court. If Dr. Modesto Mora conducted an examination of Acosta and if his report gives any indication that Acosta was incompetent, the writ must issue subject to the right of the state to retry Acosta. If no report by Dr. Modesto Mora is found, the Mutter and Castiello reports are effective substitutes. They were ordered the day after the trial for the purpose of inquiring into Acosta's competency. They fairly meet the condition of the pretrial agreement and require that the writ be granted subject, of course, to the right of the state to retrial. If Dr. Modesto Mora examined Acosta and gave no indication that he was incompetent, Acosta would not be entitled to relief by virtue of the pretrial agreement because the agreement

---

**3.** We adopt this as the most likely interpretation of the pretrial conversation. The alternative reading that could have been given is that the trial judge would vacate only the stipulation of Acosta's competency and would inquire further into his mental condition were the Mora

report to come in negatively. Enforcement of this agreement would entail holding a competency inquiry now, if such an inquiry is feasible. This is the same resolution we reach in part II, however, because this is also the remedy for a *Pate* violation.

would have been carried out. Only in this event need the district court consider the remaining issues in this case.

## II. Competency to stand trial

Acosta contends that his procedural due process rights were violated when the state trial judge failed to examine him to determine whether he was competent to stand trial, and that his substantive constitutional right to a fair trial was violated because he was in fact incompetent when tried. We find it necessary to reach only the procedural contention.

▮▮▮ The distinction between a procedural and a substantive attack based on competency at the time of trial has been explained in detail in opinions of the former Fifth Circuit. *See Nathaniel v. Estelle*, 493 F.2d 794, 796, 798 (5th Cir. 1974); *Davis v. Alabama*, 545 F.2d 460, 465 (5th Cir. 1977); *Zapata v. Estelle*, 588 F.2d 1017, 1020–21 (5th Cir. 1979). Summarizing briefly, a criminal defendant enjoys the fundamental substantive guarantee of not being tried if he is unable to "consult with his lawyer with a reasonable degree of rational understanding" or if he does not possess "a rational as well as a factual understanding of the proceedings against him." *Dusky v. U. S.*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960). To protect this guarantee a defendant also enjoys the procedural advantage that if sufficient doubt exists of his competency to stand trial the trial court must *sua sponte* inquire into his competency. *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975). Such an inquiry is referred to as a "*Pate* hearing."

The Supreme Court has not attempted to promulgate a standard describing the quantum of doubt that must exist before a trial judge is required to hold a *Pate* hearing. *Drope v. Missouri*, 420 U.S. 162 at 172–173, 95 S.Ct. 896, 904–05, 43 L.Ed.2d 103. Under Fifth Circuit law several standards have been enunciated. The most commonly used

is that a *Pate* hearing is required if the evidence known to the trial judge creates a "bona fide doubt" as to competency. *E.g., Nathaniel, supra; Davis, supra.*[4] The required level of doubt has also been referred to, however, as "substantial," *U. S. v. Hayes*, 589 F.2d 811, 823 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *Tyler v. Beto*, 391 F.2d 993, 997 (5th Cir. 1968), *cert. denied*, 393 U.S. 1030, 89 S.Ct. 642, 21 L.Ed.2d 574 (1969); *see Lee v. Alabama*, 386 F.2d 97, 105 (5th Cir. 1967) (en banc), *cert. denied*, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969), and sometimes more emphatically as "real, substantial, and legitimate doubt," *Pedrero v. Wainwright*, 590 F.2d 1383, 1387–88 (5th Cir. 1979), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1980), or as evidence sufficient to "clearly and unequivocally create reasonable doubt," *Grissom v. Wainwright*, 494 F.2d 30, 32 (5th Cir. 1974). Thus, as in other areas of constitutional law, no single phrase has yet evolved that captures all nuances of the contours of *Pate*, and so a close review of the facts is required that we may make our independent constitutional assessment of whether sufficient doubt of competency existed within the time frame of the trial and immediately related proceedings, *Reese v. Wainwright*, 600 F.2d 1085, 1093 (5th Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979), that the trial court was required to make a determination of Acosta's competency.

Acosta attempted suicide, confessed because he wanted to be executed, was promptly found to be a chronic schizophrenic lacking capacity to stand trial, and was committed for treatment. After almost one and a half years of treatment, he was still suffering from a major mental illness, but was diagnosed as being in remission. He was released as ready to stand trial but required a daily dosage of antipsychotic drugs and after care. The record is silent whether he received the drugs or after care.

---

4. *Zapata*, 588 F.2d at 1020 n.1, describes the somewhat inadvertent manner in which this standard arose.

Beginning one day after release and up to pretrial the court manifested its knowledge that there existed a question of Acosta's competency, and its concern over his capacity, by successively appointing a hospital, Dr. Georgia, and Dr. Miguel Mora to reexamine him. Ordering these examinations manifested that the court did not accept the forensic board's release statement as settling the question. Both the fact and the content of the colloquy at the pretrial hearing evidence that the competency issue had not been resolved at that point. Moreover, the fact of the appointment of Drs. Mutter and Castiello, made one day after conviction, to determine Acosta's competency to be sentenced, indicates that the question was still open at the time of trial.

■ On the basis of this record the district court concluded that there was not sufficient doubt over Acosta's mental condition to require the trial judge to hold a competency inquiry. We disagree. The district court placed weight on defense counsel's stipulation to his client's competency at the pretrial conference. This was not an informed opinion based on the attorney's own observations, however, but was based only on the medical reports contained in the record. See pp. 951–952, *supra.* Moreover, the stipulation was specifically conditioned upon what Dr. Mora's report might reveal when it came in. Thus, the stipulation carries little weight. The district court also relied on the several appointments made by the trial judge after Acosta's release from the state hospital, see page 951, *supra,* as·an indication that any potential doubts were resolved. This inference could not be drawn. Three appointments for mental examinations were made before the pretrial conference; the record does not indicate that any were conducted. At the pretrial conference the trial judge felt it necessary to make an additional ap-

pointment, and most significantly, the day after the trial the judge made two additional appointments specifically to inquire into Acosta's competency. These are strong indications that real doubt existed as to Acosta's competency and that this doubt continued throughout the pretrial and trial proceedings.[5]

■ Considering all of this evidence— Acosta's history of serious mental illness, the permanency of his illness, his need for drugs and continued care, the absence of any indication of follow-up care or further examinations during the four month period between his release from the hospital and trial, and the trial judge's manifested concern over Acosta's competency—we conclude that Acosta's procedural rights under *Pate v. Robinson* were violated.

■ This conclusion is reached on the basis of a manifestly incomplete record, however, because of the numerous mental examinations that were ordered but with no results in this record. Although these examinations may have never occurred, it is possible that they took place, and they may give evidence of Acosta's competency, dissipating the doubt we perceive based on the extant record. There is no need, however, to allow the state a chance to produce this missing evidence and to show that no doubt existed before trial, because additional evidence known to the trial judge that arose after trial would create a new doubt. We refer to the Castiello and Mutter reports, ordered the day after trial and given two and eight weeks hence, unequivocally expressing the opinion that Acosta was incompetent at the time he was examined. See pp. 952–953, *supra.*[6] Absent a prior conclusive determination of Acosta's competency rendered at the time of trial, this evidence is sufficient to raise a serious doubt concerning his competency when he was tried. *Cf. Pride v. Estelle*, 649 F.2d

5. The conviction would be equally infirm if Acosta were incompetent at the pretrial conference, where he waived his right to a jury trial, as if he had been incompetent at the trial.

6. Although the Mutter and Castiello reports were contained in the record before the district

court, the court did not consider them, evidently because they were not mentioned to the court with clarity or in a timely manner but mentioned only in a petition for rehearing and in another context.

324, 326–27 (5th Cir. 1981) (similar reports create a "real, substantial, and legitimate doubt").[7] It is clear that no conclusive determination of Acosta's competency was made on the eve of trial. We know this because the trial judge ordered additional examinations the day after trial. We hold, then, that even if there was no *Pate* violation before trial, there was sufficient doubt after trial to require the trial judge to determine whether Acosta had been incompetent any time during the trial and pretrial proceedings.

The fact that this doubt may not have arisen until after the trial does not take this case outside of the *Pate* doctrine. The rule of this circuit is that a "*Pate* violation . . . may occur only in the time frame encompassed by the trial itself and immediately related proceedings." *Reese v. Wainwright, supra*, 600 F.2d at 1093. The evidence creating sufficient doubt here arose as a result of a direct inquiry into the defendant's competency ordered by the judge who conducted the trial one day after the trial. It was thus immediately and intimately related to the continuous trial and posttrial proceedings.

■ We remand this case to the district court to apply the remedies for a *Pate* violation. As we have explained at length elsewhere, *see, e.g., Lee v. Alabama*, 386 F.2d 97, 108 (5th Cir. 1967) (en banc), *cert. denied*, 395 U.S. 927, 89 S.Ct. 1787, 23 L.Ed.2d 246 (1969); *Lokos v. Capps*, 625 F.2d 1258, 1268 n.5 (5th Cir. 1980); *Martin v. Estelle*, 583 F.2d 1373 (5th Cir. 1978), the district court is to first determine whether an adequate and meaningful *nunc pro tunc* inquiry can be made into the question of whether Acosta was incompetent at any time during the trial and pretrial proceedings. If a meaningful inquiry can be held, then the district court is to determine Acosta's competency. It is obvious that the court may hold one multipurpose hearing to dispose of both levels of inquiry if it wishes.

### III. Uninformed plea

The day of the trial, the court was informed through the following colloquy that the defendant's sanity at the time of the offense was the only element of the crime that would be contested, in exchange for reduction in the offense charged from first to second degree murder:

THE COURT: [After swearing in the interpreter] Are you qualified to interpret from Spanish to English and English to Spanish?

THE INTERPRETER: Yes.

MR. GRAVES: (prosecutor) If you would explain the stipulation, and I will repeat it again for the record. If the Court accepts the stipulation between Mr. Negretti and myself, the State would offer to reduce the charges from First Degree Murder to Second Degree Murder on the stipulation from the Defendant through this counsel, that the facts as stated in the indictment establishes a prima facie case as to Second Degree Murder. The only issue, really, that the Court would have to consider is whether or not the Defendant knew right from wrong at the time of the offense.

THE COURT: Did you explain that to him?

THE INTERPRETER: Yes, I did.

THE COURT: The Court would accept the stipulation. Let us proceed, please.

Acosta contends that this stipulation is equivalent to a plea of guilty and that it did not meet the requirements of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), as there is no indication in the record that it was made with knowledge of its consequences. Assuming arguendo that the *Boykin* rule applies to a stipulation such as this, the trial court took adequate steps to ensure Acosta's understanding of the stipulation. Although in the abstract it is unclear what it means to stipulate that the facts in the indictment

---

7. This case is distinguishable from *Zapata v. Estelle, supra*, 588 F.2d at 1020–21, where the posttrial report was more ambiguous and directed only toward the issue of whether the convicted defendant should be given psychiatric treatment.

state a prima facie case,[8] the import of the stipulation in this case was made clear: the court would only need to consider whether Acosta was sane at the time of the offense. Because Acosta spoke only Spanish and the judge only English, the interpreter was sworn in and was asked to explain the stipulation to the defendant as it had been explained to the court. In addition the trial judge affirmatively assured himself that this had been done. *See U. S. v. Grove*, 632 F.2d 387, 389 (5th Cir. 1980) (under federal rules, it is enough that judge requests counsel to explain plea and then satisfies himself that this has been done).

 Acosta does not contest that these steps were taken; rather, his contention is that he was unable to understand the proceedings or the attempts to communicate with him. In essence, then, Acosta contends that the stipulation was not informed because he was incompetent. To this extent Acosta's argument here is subsumed within his competency argument: if he was incompetent then all proceedings were invalid and must be redone; if not, then this argument has no factual basis.

### IV. Sufficiency of the evidence

Acosta next contends that there was insufficient evidence for the trial court to find that he knew right from wrong and was capable of understanding the nature and consequence of his acts at the time of his crime.[9] The standard under which we review the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the [defendant sane at the time of the offense] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in the original).

[11] The expert evidence concerning sanity was as follows. Ms. Perez, a clinical psychologist, examined Acosta two months after the crime and found him then to be "extremely psychotic." After repeated direct examination she proffered, somewhat hesitantly, the opinion that to a reasonable psychological certainty Acosta did not know right from wrong at the time of the offense. On cross examination, she acknowledged that a person could be psychotic and still know right from wrong, that she had never questioned Acosta concerning the events of the crime, and that she had not reviewed his medical history. Dr. Georgia, a psychiatrist who examined Acosta a year and one half after the crime, testified that he could not say with a reasonable medical certainty that Acosta did not know right from wrong but that there was a reasonable probability that he did not. Dr. Lateulade, the psychiatrist who began treating Acosta three weeks after the crime, stated that too much time had passed when he first saw Acosta to make a determination as to his sanity. Finally, Dr. Castiello's report of his examination of Acosta four days after the offense was received into evidence[10] in which Castiello said that there was "evidence to indicate" that Acosta was insane.

Lay evidence was introduced by the prosecution. Detective Ramirez, who questioned Acosta 12 hours after the offense and took his confession, testified that Acosta did not act crazy, was "very lucid and coherent," and gave full details of the slaying. The seven year old son of the victim testified that he had lived with Acosta for a time and detailed two instances where Acosta had reprimanded him for breaking rules, thereby indicating that Acosta was aware of the requirements of the law. The victim's son also said that although Acosta used to get very mad, "every time . . . he

---

**8.** This is particularly so for this court because the indictment is not in this record.

**9.** This is the *M'Naghten* rule, which prevails in Florida. *See Anderson v. State*, 276 So.2d 17 (Fla.1973).

**10.** Dr. Castiello did not testify, although he was subpoenaed, evidently because he was on vaca-

tion. Defendant now complains of a denial of his rights to confrontation and to present evidence in his favor because the trial was not continued until Dr. Castiello could be found. As the district court ruled, this is frivolous, since the report was introduced by the defense itself and no continuance was requested.

seemed to know very well what he was doing," and that Acosta never acted "crazy" in front of him. Finally, a bail bondsman who knew Acosta testified that Acosta appeared mentally ill two to three weeks before the crime, but that when he saw Acosta several days later he was "okay."

Acosta did not testify but his confession is in evidence. The events of the slaying are somewhat obscure as to Acosta's precise behavior at the time of the slaying. Acosta confronted his girlfriend in a hotel room with the information that she was seeing other men for money. Her admission of this prompted the strangling. Acosta was seen nude on the street corner with slashed wrists; he also took a quantity of pills in an attempt to commit suicide. The police found him in a semiconscious and incoherent condition.

 We are unable to say that no rational trier of fact could find beyond a reasonable doubt that Acosta was sane. Although Acosta was mentally ill, as the experts testified, one can suffer a mental illness and still meet the *M'Naghten* test. The defense's expert testimony was not uniformly unequivocal; indeed some of it affirmatively stated that it is not possible to have a certain understanding of Acosta's mental condition. The lay testimony was reliable and probative. In particular, the victim's son, although he was very young at the time he lived with Acosta, testified with clarity, spontaneity, and specificity. Finally, the circumstances of the crime do not positively demonstrate insanity. Acosta's incoherent state when arrested is attributable to his attempts at suicide rather than to preexisting insanity. Viewing this evidence as a whole in the light most favorable to the prosecution, a finding of insanity was not required. *See Reese v. Wainwright*, 600 F.2d 1085, 1089–90 (5th Cir.), *cert. denied*, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979) (accord, under similar facts); *United States v. Alvarez*, 458 F.2d 1343, 1344 (5th Cir. 1972).

## V. Admission of confession

Twelve hours after the crime Acosta confessed to killing the victim. This confession was introduced into evidence by the prosecution. It is unclear from the record whether the evidence was relevant only to the issue of Acosta's sanity or was also admitted for the purpose of demonstrating that he committed the killing. At times counsel seemed to agree that the stipulation entered into that the indictment stated a prima facie case for second degree murder was in effect an admission that Acosta committed the crime.[11] Elsewhere, however, the stipulation appears to mean less than this:

> THE COURT: We have a stipulation that the victim had been killed and we have a stipulation that she was killed by the Defendant.
>
> MR. NEGRETTI: No, we don't have that stipulation. No, sir; we have a stipulation in the cause of death. We don't have a stipulation as to the Defendant killing her.
>
> MR. GRAVES: We do have a stipulation that the facts are set forth in the indictment and establishes a prima facie case of Second Degree Murder.
>
> MR. NEGRETTI: That we have, Your Honor.

Also, the trial judge in rendering his guilty verdict expressly relied on the confession.

A second matter of confusion concerning the confession is whether it was admitted into evidence with the express consent of Acosta's attorney. In the middle of the trial it was discovered that one of the defense witnesses, the psychiatrist who examined Acosta at the time of his arrest, did not respond to his subpoena. The prosecution offered to allow the doctor's report to

---

11. For example, at the start of the trial, the prosecutor explained that the stipulation meant that "the only issue that the court would have to consider or be concerned with is whether or not the defendant knew right from wrong at the time of the offense" and defense counsel responded "so stipulated, Your Honor." Also, in the middle of the trial, defense counsel stated with reference to Dr. Castiello's report that "I am not offering it that this man committed a crime. I think we have a stipulation that that has occurred."

be introduced in lieu of his testimony if the defense would allow defendant's confession to come in. There is no indication that this offer was then accepted. Instead the judge proceeded to hear other witnesses in the hope that the psychiatrist would arrive. Later in the trial, when the witness was discovered to be out of town on vacation, the prosecution agreed to allow the psychiatrist's report to come in "as a convenience to the court." Subsequently, when the prosecution proffered a duplicate of Acosta's confession, defense counsel stipulated that the duplicate could be entered instead of the original.

Based on these facts Acosta claims a procedural constitutional violation occurred because his confession was introduced without a prior determination that the confession was voluntary and informed. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Acosta also alleges a substantive constitutional defect, namely that his conviction was based in part on a confession that was in fact involuntarily given. *See Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1938).

*Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), establishes procedural requirements to be followed when a defendant challenges at trial the voluntariness of his confession. That case held that, in a trial before a jury, the judge must make a separate determination of voluntariness before the confession can be submitted as evidence to the jury. We need not decide whether a *Jackson v. Denno* type hearing is required in a bench trial, for the Supreme Court has squarely held that this procedural safeguard is not constitutionally required unless "some contemporaneous challenge to the use of the confession" is made. *Wainwright v. Sykes*, 433 U.S. 72, 86, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). No such objection was made here. Therefore there was no procedural constitutional violation with respect to the introduction of the confession.

We decline to reach the substantive aspect of Acosta's voluntariness challenge, primarily because the district court did not address the substantive contention, only the procedural one, and because of the unresolved factual ambiguities just outlined. Moreover, it may not be necessary to reach this issue if it is found that Acosta must be retried on the basis of parts I or II above.

VI. Ineffective assistance of counsel

We also remand this issue. One of the principal asserted defects of defense counsel's performance is that he failed to request an examination into Acosta's competency near the time of trial and went on to try the case with a substantial doubt outstanding as to Acosta's competency. The seriousness of this allegation assumes markedly different magnitudes depending on whether Acosta was examined by the various appointed physicians and depending on the results of any such examinations. Because these matters are not in the record but are likely to be resolved by the district court on remand, this issue is best left for reconsideration by the district court. If a retrial is ordered under parts I or II, this issue will also be mooted.

To summarize our disposition of this case, we REVERSE the district court's dismissal with respect to defendant's competency at the time of trial and REMAND for further proceedings, we VACATE the district court's dismissal with respect to ineffective assistance of counsel and the substantive aspect of petitioner's involuntary confession contention and REMAND for further proceedings if necessary, and we AFFIRM the district court's dismissal with respect to all other contentions.