**James Lee SPENCER, Petitioner,**

v.

**Walter D. ZANT, Superintendent, Georgia Diagnostic & Classification Center, Respondent.**

No. 82–8408.

United States Court of Appeals, Eleventh Circuit.

Sept. 30, 1983.

Opinion on Granting of Rehearing En Banc Dec. 13, 1983.

Edward D. Tolley, Athens, Ga., Anthony G. Amsterdam, John Charles Boger, Jack Greenberg, James M. Nabrit, III, Joel Berger, Deborah Fins, James S. Liebman, New York City, for petitioner.

Virginia H. Jeffries, Atlanta, Ga., for respondent.

Before KRAVITCH and JOHNSON, Circuit Judges, and LYNNE *, District Judge.

JOHNSON, Circuit Judge:

James Lee Spencer was convicted of murder, aggravated assault, and escape in Georgia state court in 1975. He was sentenced to death for the murder charge and to two concurrent ten year terms for the assault and escape charges. After an unsuccessful effort to obtain a writ of habeas corpus in state court, Spencer brought this petition for a federal writ of habeas corpus under 28 U.S.C.A. § 2254. The district court denied the petition. We vacate the district court's judgment in part and remand for evidentiary hearings on two of Spencer's claims.

I. BACKGROUND

The events leading up to Spencer's 1975 conviction occurred while he was a prisoner in Georgia. On October 31, 1974, Chief Deputy Sheriff L.O. Beazley was transporting Spencer from Richmond County Jail to the Georgia State Prison in Reidsville.

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Beazley's father-in-law, Lett Williams, accompanied Beazley in the front seat of the transfer vehicle. Spencer sat in the back seat.

Somewhere between Augusta and Millen, Georgia, the radio dispatcher came on the air and announced, "Chief, the passenger you've got is supposed to have a gun." Immediately upon hearing the report, Spencer shot Beazley three times, and then a fourth time in the head when Beazley stopped the car and attempted to open the door. Before crawling out the door, Beazley managed to open the passenger door and push Williams out of the car. According to a witness who drove up a few minutes later, Williams was standing behind the car calling for help. He then ran around the car and put his head inside one of the windows. Spencer, who was still inside, shot Williams, kicked out the rear window, and attempted to flee. During the flight, he was apprehended by a state patrolman who had arrived on the scene. Beazley survived, although he was permanently blinded in one eye; Williams died of a gun shot wound to the head.

At Spencer's trial, a former Richmond County jail prisoner testified that he and Spencer had discussed escaping. He further testified that on October 31, the day of Spencer's escape attempt, he saw Spencer strap a pistol to his leg and cover it with a sock, and that, as Spencer left the jail, he said, "This here is the day." There was also trial testimony that Spencer had made a homemade handcuff key and concealed it in his mouth, and that he spit the key into an officer's hand when he was apprehended.

Spencer appealed his conviction and sentence to the Georgia Supreme Court, which affirmed with one justice dissenting. *Spencer v. State,* 236 Ga. 697, 224 S.E.2d 910, *cert. denied,* 429 U.S. 932, 97 S.Ct. 339, 50 L.Ed.2d 302 (1976). Spencer filed a petition in Tattnall County Superior Court for a writ of habeas corpus. After an evidentiary hearing, the court denied his petition and the Georgia Supreme Court again affirmed. *Spencer v. Hopper,* 243 Ga. 532, 255 S.E.2d 1, *cert. denied,* 444 U.S. 885, 100 S.Ct. 178,

62 L.Ed.2d 116 (1979). Spencer then brought this federal habeas petition in the United States District Court for the Southern District of Georgia, alleging that, *inter alia:* 1) the trial court's jury instruction at his hearing on his special plea of insanity violated his due process rights; 2) his jury array was unconstitutionally composed insofar as blacks and women were underrepresented; 3) certain jurors were improperly dismissed during voir dire in violation of the rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); 4) the trial court's jury instruction violated *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1977), by relieving the state of the burden of proof on an element of the crime; and 5) the Georgia death penalty is arbitrary and discriminatory and therefore unconstitutional as applied. The petition also included a request for evidentiary hearings.

The district court consolidated Spencer's claims with similar claims presented in two other pending habeas cases, *Mitchell v. Hopper,* CV No. 478–132, and *Ross v. Hopper,* CV No. 478–162. The district court heard argument from the parties in these three cases as to the necessity of evidentiary hearings on certain of the consolidated claims. At the conclusion of this hearing, the court ruled that no evidentiary hearings were required for the challenge to the constitutionality of the death penalty as applied, but that it would receive some evidence on the *Witherspoon* issue. The court also ruled that evidentiary hearings would be held on the petitioners' grand and traverse jury challenges, with the hearings being limited mainly to the issue of whether petitioners could demonstrate "cause" and "prejudice" under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), for their procedural default on these claims in state court. In addition to the hearings on these issues, the court later held hearings on the individual claims not covered at the hearings on the common claims—which in Spencer's case included his challenge to the jury instruction at his special plea hearing and his *Sandstrom* claim. After deciding that no evidentiary hearings were re-

quired on the individual claims, the district court issued an opinion holding against all claims presented by petitioners Spencer, Mitchell, and Ross.[1] *Mitchell v. Hopper,* 538 F.Supp. 77 (S.D.Ga.1982).

## II. THE SPECIAL PLEA OF INSANITY

In Georgia, a challenge to the competence of the defendant to stand trial is raised by a "special plea of insanity." On January 6, 1975, the first day of jury selection in Spencer's trial, Spencer filed a number of pro se motions, including a special plea of insanity. The plea alleged that he had lost his memory concerning the events of the crime and thus could not assist in his own defense. The trial judge immediately suspended jury selection and empanelled a jury for the purpose of hearing the special plea. The court asked defense counsel, one John H. Ruffin, to represent Spencer at the special plea hearing; Ruffin responded that he felt the motion was "inappropriate." *Spencer v. State,* 224 S.E.2d at 913. The court then ordered an independent psychiatric examination of Spencer. Dr. Hervey M. Cleckley, the person who conducted the examination, testified at the special plea hearing on January 7. Dr. Cleckley testified that, despite Spencer's claim during the examination to suffering a memory loss, "My impression was that he was malingering, that he was assuming the loss of memory, and I was not convinced that it was that gross loss of memory he claimed." Cleckley further testified that, in his opinion, Spencer understood the charges against him and was capable of consulting with his defense counsel. Mr. R.J. Adair of the Richmond County sheriff's office also testified at the hearing that, after talking with Spencer 12 to 15 times since October 31, 1974, Spencer seemed well oriented, his answers to questions were "very precise," and, in Adair's opinion, Spencer was "very much sane" the last time he had talked with him.

■ At the end of the hearing, the trial judge began a four page charge to the jury with the following opening paragraph:

Gentlemen of the jury, you are hearing the case of James Lee Spencer which is a special plea of insanity filed by him, in which he alleges that he is insane, and you will have this petition out with you when you go to your jury room. Now, this is, in effect, a civil action which you must decide, and the burden of proof is upon James Lee Spencer to prove this case by what is known as a preponderance of the evidence. That is, by *evidence that a person with a reasonable and impartial mind would believe is stronger than the evidence which has been introduced by this witness.* (emphasis added).

Spencer argues that his due process rights were violated insofar as the italicized phrase of this paragraph of the instruction directed a verdict against him by indicating to the jury that his testimony had not been adequate to prove his incompetence. The state disagrees that this phrase had the effect of directing a verdict against him, contending that "this witness" referred to either Dr. Cleckley or Mr. Adair. In support of his due process argument before the district court, Spencer relied on *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), for the proposition that the burden should be upon the state to prove every element of the offense beyond a reasonable doubt. The district court properly rejected this argument on the ground that under Georgia law a defendant's competence to stand trial does not implicate his state of mind at the time of the offense and thus is not an element of the crime. *Banks v. State,* 246 Ga. 178, 269 S.E.2d 450, 452 (1980). Thus, in this appeal, we evaluate Spencer's due process claim not in terms of whether the jury instruction impermissibly shifted the burden of proof against Spencer, but instead in terms of whether Spencer's due process right to a competency hearing was violated. *See Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *Acosta v. Turner,* 666 F.2d 949, 954 (5th Cir. Unit B 1982).

---

1. Ross's appeal remains pending before this Court. *Ross v. Hopper,* No. 82–8413.

The standard for whether a defendant is entitled to a hearing to determine his competence has been described as whether the doubt as to the defendant's competency is "bona fide," "substantial," "real, substantial, and legitimate," or "clear[ ] and unequivocal[ ]." *Acosta v. Turner,* 666 F.2d at 954. Once a defendant receives a hearing, Georgia law requires that the defendant bear the burden of proving his incompetence by a preponderance of the evidence. *Wallace v. State,* 248 Ga. 255, 282 S.E.2d 325, 330 (1981), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1291, 71 L.Ed.2d 471 (1982); *Coker v. State,* 234 Ga. 555, 216 S.E.2d 782, 790 (Ga.1975), *rev'd on other grounds sub nom. Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Evaluating the evidence actually offered at Spencer's incompetency hearing with these standards in mind, we conclude that Spencer wholly failed to establish any substantial or bona fide doubt that he was competent to stand trial. The uncontradicted expert testimony of Dr. Cleckley and the testimony of Mr. Adair clearly established that Spencer was both competent and capable of assisting in his defense at trial. Thus, even if the last phrase of the first paragraph of the jury instruction directed a verdict against him,[2] we hold that it did not violate his due process right to a competency determination.

## III. THE JURY CHALLENGE

In his brief to this Court, Spencer, who is black, alleges that blacks and women were grossly underrepresented on the jury array from which his jury was selected.[3] According to Spencer, he introduced in his state habeas proceedings "binding admissions" by the Burke County jury commissioners that blacks composed 16.6% of the 1975 Burke County jury list and that women composed 25.9% of the list. According to the 1970 census figures, which Spencer alleges he introduced at the state habeas hearing, blacks and women made up 60.2% and 53% of the county population respectively. These statistics suggest a disparity of 43.6% between the percentage of blacks on the Burke County jury list and the percentage of blacks in the county, and a disparity of 27.1% between women on the jury list and the percentage of women in the county. Because of the posture of this case at this point, the record is not adequately developed to permit reliable statistical analysis. However, Spencer's allegations at least seem to state a colorable claim of discrimination in the selection of jurors in Burke County.[4]

The state, however, argues that Spencer's jury claim may not be considered in federal court because he forfeited the claim in state court. The state habeas court, and the Georgia Supreme Court on appeal, held that Spencer did not timely challenge the jury array and that he subsequently waived the challenge during his trial. Partly on the basis of the first of these holdings, the federal district court concluded that Spencer's non-compliance with Georgia procedural law amounted to procedural default. After hearings, the district court also held that Spencer's procedural default could not be excused under the "cause" and "prejudice" test of *Wainwright v. Sykes,* 433 U.S.

2. Although we do not decide whether the instruction directed a verdict against Spencer, we note that, while the end of the first paragraph of the instruction may have suggested the trial judge's view of the evidence, the next four pages of the instruction clearly left the impression that the judge considered Spencer's claim as to his lack of memory and incompetence to be for the jury to decide.

3. In the state courts, Spencer had also alleged defects in the composition of the grand jury list. However, he did not raise this challenge until after his conviction and we do not consider it in this appeal.

4. In 1977, the United States District Court for the Southern District of Georgia entered a consent decree in which the court held that the 1976 Burke County grand and traverse jury lists were unconstitutionally composed with respect to blacks and women. *See Sapp v. Rowland,* CV–176–94 (S.D.Ga. May 20, 1977). As the state points out, however, the consent decree contains no findings with respect to the 1975 traverse jury list, which is the list at issue in this case.

72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and therefore that his claim is barred in federal court. Spencer disagrees with the district court's default analysis and argues further that, if he did default, it should be excused under *Sykes.* We conclude in Part A below that the state law grounds for a finding of procedural default are not adequate and, for the reasons discussed in Part B below, do not decide the question of whether the alleged default should be excused under *Sykes.*

A. Whether there was procedural default

The district court addressed three possible grounds for concluding that Spencer had defaulted on his jury claim. In this appeal, the state urges two of these grounds upon us as a basis for affirming the conclusion that Spencer defaulted.[5] The first ground is that Spencer did not timely challenge the array as required under Georgia procedural law. The second ground is that, even if he did timely challenge the array, he waived his claim through Ruffin, his lawyer, at a later point in the trial. We address each of these grounds in turn.

1. *Timeliness of the challenge.* As discussed below, most jury challenge procedural default cases in Georgia involve defendants who waited until after the trial was over to challenge their jury arrays. Spencer's case, however, is unusual in that he raised his challenge during voir dire. Nevertheless, the Georgia courts held that his challenge was not timely. Because Spencer argues that this holding unfairly deprived him of the opportunity to present his federal constitutional claim, we analyze the relevant Georgia statutes and cases in some detail.

The Georgia statute pertaining to the assignment of jury panels to defendants provides that:

The clerk shall make out three lists of each panel and shall furnish one to the prosecuting counsel and one to the counsel for the defense. The clerk shall then

call over the panel and it shall immediately be put upon the accused.

O.C.G.A. § 15–12–161 (formerly Ga.Code § 59–802). The provision for challenging the array provides:

The accused may, in writing, challenge the array for any cause going to show that it was not fairly or properly impaneled or ought not to be put upon him. The court shall determine the sufficiency of the challenge at once. If sustained, a new panel shall be ordered; if not sustained, the selection of jurors shall proceed.

O.C.G.A. § 15–12–162 (formerly Ga.Code § 59–803). Although the statute requires that a jury challenge be in writing, it does not specify when the challenge must be made. The state, however, points to the habeas corpus statute, which currently provides in pertinent part that:

Except for objections relating to the composition of a grand or trial jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege, which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly, and intelligently. The right to object to the composition of the grand or trial jury will be deemed waived under this Code section unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has otherwise become final.

O.C.G.A. § 9–14–42(b) (formerly Georgia Code § 50–127(1)). The state suggests that this statute establishes a basis for the state court holdings that Spencer could not pursue his federal claim because the conviction and sentence had "otherwise become final," and he had not shown cause to pursue it. This, however, begs the question of precisely when the jury challenge must be raised

---

5. The ground which the state chose not to argue in the district court and in this appeal is

that Spencer waived his claim by not pursuing it in his direct appeal. *See* note 11 *infra.*

in the first place in order to save it for subsequent federal review. More importantly, while O.C.G.A. § 9–14–42 may in this case properly establish what grounds for relief can be presented in a state habeas petition, it cannot form the basis for a finding of procedural default in Spencer's trial. This is because the relevant sentence of this provision, the second sentence, did not become effective until April 24, 1975— over three months after Spencer's trial. *See* 1975 Ga.L. 1143, § 1.[6]

Georgia case law also does not suggest precisely when a defendant must challenge the jury array. The rule, often repeated in Georgia cases, is that "[t]he procedure in this state has long required a criminal defendant to raise a challenge to the jury lists at the time the jury is 'put upon him,' or else he waives his right to object." *Young v. State,* 232 Ga. 285, 206 S.E.2d 439, 442 (1974), *quoted in Farley v. State,* 155 Ga. App. 188, 270 S.E.2d 361 (1980). The difficulty with applying this rule is that it is not clear when the process of putting the jury upon the defendant begins and when it ends. The statutory provisions quoted above make reference to putting the jury upon the defendant, but they do not establish when the process occurs. In *Cochran v. State,* 62 Ga. 731, 733 (Ga.1879), the Georgia Supreme Court explained that "putting the array upon the prisoner . . . is the ancient mode of commanding his attention to the personnel of the panel, and of warning him to exercise the right to challenge." A discussion contained in the recent case of

*Walls v. State,* 161 Ga.App. 235, 291 S.E.2d 15, 17–18, *cert. denied* (1982), suggests that the putting upon process continues at least through voir dire. After noting that in Georgia "[t]here is no particular ceremony or form of words required to put the jury upon the defendant when the panel of jurors is 'put upon the accused,'" the court went on to state:

> Under the particular facts and circumstances of the case sub judice we fail to see how this defendant could complain that the panels of jurors had not been "put upon" him. There is absolutely no indication that defense counsel was interrupted in any way during the conduct of the voir dire of each and every individual prospective juror making up the four panels while each panel was in the jury box nor deprived of the right to challenge any of them. This was not an instance where a defendant was required to commence selecting a jury from each panel as soon as the voir dire of that particular panel was complete. In the case sub judice defendant had the benefit of the voir dire of four panels of 12 prospective jurors each before being required to commence selecting the jury from 46 qualified prospective jurors. We find no merit in the complaint that the court failed to "put the panels of jurors upon" the defendant.

*Id.* Still, *Walls* does not provide a definitive answer to the question of when the process begins and ends. And, despite the

---

**6.** The provision in effect at the time of Spencer's trial read as follows:

> Rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly and intelligently.

1967 Ga.L. 835, 836. According to one commentator, because of this provision, enacted in 1967 by the Georgia legislature, "the Georgia Supreme Court has consistently held that a claimed denial of [a right arising under the United States Constitution] shall not be considered waived for purposes of habeas corpus relief merely because the petitioner did not timely and properly object in the sentencing court to the alleged denial." Wilkes, *Postconviction Habeas Corpus Relief in Georgia: A Decade After the Habeas Corpus Act,* 12 Ga.L. Rev. 249, 260 (1978). Thus, until April 1975, the Georgia statute on its face provided that "rights conferred or secured by the Constitution of the United States," including, presumably, the right to a constitutionally composed jury array, could not be deemed waived without a showing of intentional relinquishment or abandonment "done voluntarily, knowingly, and intelligently." *See Mitchell v. Smith,* 229 Ga. 781, 194 S.E.2d 414, 418 (1972).

language in *Young v. State, supra,* our review of the holdings in Georgia cases reveals that the Georgia courts have in fact provided little guidance on the subject. While there are dozens of Georgia cases finding waiver of the right to challenge the jury array by failure to timely object, these cases involve a complete failure to raise a challenge prior to the jury verdict. Three lines of cases dominate this area: those in which the defendant waived his jury challenge by waiting until a new trial motion to raise the challenge for the first time, *see, e.g., Cornelious v. State,* 193 Ga. 25, 17 S.E.2d 156, 160 (1941), those in which the defendant waived his challenge by waiting until his appeal to raise it for the first time, *see, e.g., Williams v. State,* 232 Ga. 203, 206 S.E.2d 37, 40 (1974), and those in which the defendant waived his challenge by waiting until the state habeas proceeding to raise it for the first time, *see e.g., Goodwin v. Hopper,* 243 Ga. 193, 253 S.E.2d 156, 159 (1979). None of these lines of cases answers the question of when, *during the trial,* the defendant is held to have waived his challenge.

Nor do the policy reasons applicable to Georgia's jury challenge waiver rule suggest exactly when waiver should become effective. Georgia courts seem to have identified two policies supporting waiver. The first is that a timely challenge to the array provides the trial court with an opportunity to correct whatever defects may exist without the need to waste time retrying the case. *See, e.g., Williams v. State,* 31 Ga.App. 173, 120 S.E. 131, 132 (1923). The second is that a waiver rule prevents "sandbagging" by defendants who prefer to wait until the jury's decision to decide whether to challenge its legality. *See, e.g., Williams v. State,* 210 Ga. 665, 82 S.E.2d 217, 219–20 (1954), *remanded sub nom. Williams v. Georgia,* 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161 (1955). Both of these policies were recently recognized by the United States Supreme Court in a discussion of a Louisiana requirement that a defendant challenge the constitutionality of the grand jury before his trial commences. Discussing time requirements such as Louisiana's (and Georgia's in the case before us), the Court drew an analogy to the waiver provisions of Federal Rule of Criminal Procedure 12(b)(2):

> "The waiver provisions of Rule 12(b)(2) are operative only with respect to claims of defects in the institution of criminal proceedings. If its time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult."

*Francis v. Henderson,* 425 U.S. 536, 540, 96 S.Ct. 1708, 1710–11, 48 L.Ed.2d 149 (1976) (quoting *Davis v. United States,* 411 U.S. 233, 241, 93 S.Ct. 1577, 1582, 36 L.Ed.2d 216 (1973)). In the context of Georgia's jury challenge waiver rule, these two policies explain why Georgia courts have refused to permit a defendant to wait until after the verdict to raise a challenge for the first time. They provide far less guidance, however, as to when the challenge should be raised during the trial.

With this background in mind, we turn to the facts of Spencer's efforts to challenge his jury array. Forty-two jurors' names had been called, but no questioning had begun, when Spencer stopped the trial on its first day, January 6, 1975, with his special plea of insanity. When that was completed on January 7, Spencer brought the issue of the composition of the jury array to the attention of the trial court with a pro se removal petition addressed to United States

District Judge Anthony A. Alaimo in the Southern District of Georgia. In addition to alleging systematic exclusion of blacks from the Burke County jury rolls, the petition also recited his special plea and a motion for a change of venue as grounds for removal. The district attorney took the position that the removal petition had not been properly filed in federal district court,[7] and the trial court ruled that it retained jurisdiction. After this ruling, voir dire began and nineteen jurors tentatively qualified by the end of the day.

The next morning, January 8, before voir dire continued, Spencer presented a pro se motion to challenge the array, apparently also including a brief in support of his motion. After argument from the district attorney, the trial court ruled that Spencer's motion was not timely filed.

The state habeas court found that "the pro se motion to challenge the jury was in fact filed on January 8, 1975,"[8] and then held that it was not timely under Georgia law. The Georgia Supreme Court affirmed, agreeing that the motion was not timely filed and that Spencer had not shown cause for pursuing the issue on habeas corpus. *Spencer v. Hopper*, 255 S.E.2d at 3–4. The federal district court characterized this part of the state courts' holding as "well supported by the evidence." *Mitchell v. Hopper*, 538 F.Supp. at 95.

 The initial question presented for our review, then, is whether the district

court properly deferred to the holdings of the state courts that January 8 was too late for a timely challenge to the jury array. This question presents issues of state law, which as a general matter are immune from federal review. *Fox Film Corp. v. Miller*, 296 U.S. 207, 56 S.Ct. 183, 80 L.Ed. 158 (1935). However, basic principles of due process and federal supremacy dictate that, before deferring to state interpretations of state procedural rules that result in forfeiture of a federal claim, the federal court should first determine that the state rule and its interpretation are "independent and adequate." *Wainwright v. Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506. Consistent with this threshold determination,[9] the Supreme Court has ruled that a state procedural ground for cutting off presentation of a federal claim is not independent and adequate if the state applies a new procedural rule to a defendant without prior notice, or if it applies an existing rule in a surprisingly harsh or unexpected manner. *See, e.g., NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 301, 84 S.Ct. 1302, 1310, 12 L.Ed.2d 325 (1964) ("Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights.") (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457–58, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488 (1958)); *Wright v. Georgia*,

---

7. At the argument on the petition, the district attorney stated that he had

> looked into the matter this morning and we found that the petition for removal was contained in a letter, either registered or certified, addressed to the Honorable Anthony Alaimo .... We found that the letter was still in the Richmond County Jail as of this morning to be sent out in the normal course of today's mail. We found that it has not been received by the clerk of the Federal Court either in Augusta or in Brunswick. We have determined that it has not been received by Judge Alaimo .... It's our position that it hasn't been filed properly and concurred that it has no effect on this court's jurisdiction until that time.

8. In light of our holding *infra* that Spencer's alleged procedural default was not based on

adequate state grounds, we need not consider the separate argument that his January 7 removal petition was sufficient to meet Georgia's requirement that a jury challenge be "in writing," and thus that he actually challenged the jury array on January 7 rather than January 8.

9. We treat the question of whether the state law grounds for procedural default are adequate as independent of the determination, discussed below, of whether the procedural default may be excused under the "cause" and "prejudice" analysis of *Wainwright v. Sykes*. *See* 433 U.S. at 86–87, 97 S.Ct. at 2506; *Breest v. Perrin*, 655 F.2d 1, 2 n. 1 (1st Cir.), *cert. denied*, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 597 (1981)

373 U.S. 284, 291, 83 S.Ct. 1240, 1245, 10 L.Ed.2d 349 (1963) (where no prior Georgia cases had established procedural rule that was applied to defendant, rule could not preclude Supreme Court review of federal constitutional claim). Although these cases are directed to whether the Supreme Court may decide a federal claim on direct review of a state court decision, the same principles apply in collateral review. *E.g., Breest v. Perrin,* 655 F.2d 1, 2–3 (1st cir.), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 597 (1981). Commentators also have consistently noted that state procedural rules that are novel and applied retroactively so as to preclude presentation of federal constitutional claims in state court may not preclude consideration of the claims in federal court. *See, e.g.,* Brilmayer, *State Forfeiture Rules and Federal Review of State Criminal Convictions,* 49 U.Chi.L.Rev. 741, 749–50 (1982); Hill, *The Forfeiture of Constitutional Rights in Criminal Cases,* 78 Colum.L.Rev. 1050, 1078 (1978) (state forfeiture rule not adequate if "[t]he lawyer's mistake [in suffering a forfeiture of a federal claim] was attributable to the seriously uncertain state of procedural law, even though there may be no constitutional ground to complain of such uncertainty in a civil case"); Hill, *The Inadequate State Ground,* 65 Colum.L.Rev. 943, 992 (1965). Although the ideas expressed in the Supreme Court cases actually establish several different but related principles pertaining to the analysis of whether a state law ground is independent and adequate, we will refer to them collectively as falling under the "novelty" doctrine, borrowing the term from *NAACP v. Alabama ex rel. Patterson, supra.*

■ Upon thorough review of the Georgia cases discussing the jury challenge rule, we are convinced that the ruling in Spencer's case falls within the novelty doctrine so as to permit review of his federal claim in spite of the state courts' holdings that he had forfeited it. As our review of Georgia statutory and case law above makes clear,

the Georgia requirement clearly applied to prevent defendants from waiting until after the verdict to raise their challenges. The dictum in some of the cases indicating that a defendant must challenge the array as soon as the jury is "put upon" him suggests an earlier point than this, but none of the cases clearly establish when that point is. The confusion as to when a jury is "put upon" a defendant is illustrated by the district attorney's argument in Spencer's trial on the morning of January 8, when he himself suggested that the process of putting a jury upon a defendant is not completed until after voir dire is over:

> MR. ALLEN: Your Honor, in the absence of an adequate law library, we are unable to find the definitive—any definitive statement, but it's the position of the state that the challenge is not timely, that we are *already in the process of placing a panel of qualified jurors on the defendant,* and that the challenge to the array not having been filed prior to placing of the panel upon the defendant, anything pertaining to that challenge is not timely.

Trial Transcript at 171 (emphasis added). Even the Georgia Supreme Court, on review of the state habeas court's ruling against Spencer, confused exactly when the jury was put upon Spencer, first suggesting that it occurred on January 7, before voir dire began, but then also indicating that it occurred after voir dire was completed on January 15:

> "The motion challenging the array was not filed until *January 8th after the jury had already been put upon the defendant on January 7th,* following a delay occasioned by another special plea filed pro se. No evidence was even offered to support it during the next several days of voir dire in the jury selecting process extending through January 14th. Finally, on *January 15, after completion of voir dire by counsel and before the prospective jurors were put upon defendant for final reduction to the trial panel,* the

district attorney again expressly raised the question of the motion."

255 S.E.2d at 3 (quoting, with approval, from habeas court opinion) (emphasis added). We also find it significant that none of the state courts cited a single case in which a court held that a jury challenge is untimely if it is filed after the first day in the process of jury selection but before voir dire is completed. Moreover, in its briefs before the district court and before this Court, respondent points us to no Georgia case prior to those involving Spencer in which such a line was drawn. Thus, it is reasonable to conclude that Georgia's novel application of its procedural rule to Spencer, although not directly contrary to precedent, was not adequately supported by precedent so as to apprise Spencer at trial that the second or third day of voir dire was too late to raise his claim. For this reason, we hold that this state ground for procedural default is not adequate to preclude federal review of the merits of the claim.

Our holding is supported by the independent consideration that Georgia's policy interests in enforcing its default rule in this case seem weak at best. Spencer brought the issue of the composition of the jury

array to the attention of the trial court with his removal petition before voir dire began, and then offered his motion to challenge the array long before jury questioning was completed.[10] This gave the trial court more than ample opportunity to correct the array without wasting judicial resources. And, far from sandbagging, this defendant made repeated good faith efforts to present his claim to the trial court. Thus, this case does not present the comity considerations that motivated the Supreme Court in *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), to preclude a defendant from raising a challenge to the constitutionality of the grand jury that indicted him when he had ignored a state procedural default rule and waited until six years after his conviction to raise his challenge for the first time in a federal habeas petition. While respect for principles of comity and federalism requires deference to state procedural rules that may foreclose presentation of federal claims, this respect cannot extend to defendants who vigorously assert their rights at trial, only to have those who make the rules apply them in a new or unexpected way.[11]

■ 2. *Waiver of the challenge.* The state further contends that, even if Spencer

**10.** Spencer also brought the issue to the attention of the trial court again at the end of his trial, stating in closing argument:

Also, before the trial began, I further want the record to show that on 1/8/75 I pro se filed a motion to challenge the array of the jury and His Honor, the Court, refused to hold a hearing on that motion and that said motion was filed prior to the jury being impaneled.

**11.** Under some circumstances, Georgia's procedural default rule as applied to Spencer may be harsh even on defendants who have prior notice of the rule. For example, the Georgia statute requiring that defendants receive a copy of the jury list before trial does not state how far in advance of trial it must be given to them. *See* O.C.G.A. § 15–12–161. If the defendant receives the list moments before the jury is "put upon" the defendant as some Georgia courts now define that phrase, he may not have an adequate opportunity to assess his constitutional rights before he is held to have waived them. Moreover, in some cases a defendant may need to conduct voir dire in order

to assess the merits of his constitutional claim. Under the rule as applied to Spencer, the defendant would not have that opportunity. While our holding in text that the novelty doctrine precludes application of Georgia's procedural default rule to Spencer does not require an assessment of the merits of Georgia's rule itself, these considerations raise the question of whether the Georgia rule is reasonable, and whether it serves "legitimate state interests." *Cf. Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408; *Runnels v. Hess,* 653 F.2d 1359, 1365–68 (10th Cir.1981) (Logan, J., dissenting); *see also Wainwright v. Sykes,* 433 U.S. at 86, 97 S.Ct. at 2506 (assessing as part of its inquiry into whether state law procedural grounds are independent and adequate the question of whether Florida's contemporaneous objection rule is constitutional). In assessing this question, a court would consider whether the defendant had an adequate opportunity to present a federal claim, the answer to which will depend on how Georgia courts interpret and apply the procedural default rule in the future. By way of comparison, the federal statute applicable to jury challenges in federal trials requires that a defendant raise his challenge

timely filed his jury challenge, he waived it through John Ruffin, his lawyer, on January 15 when the following colloquy occurred between the Court, Ruffin, and District Attorney Allen after the court asked if both sides were ready:

> MR. ALLEN: Your Honor, we will announce ready with the understanding that there are two motions pending. One is a challenge to the array and the other is a motion for change of venue, and the state is ready to hear those motions if they're insisted upon by counsel for the accused.
>
> MR. RUFFIN: May it please the Court, I was under—well, I wasn't aware of the pendency of the motions, I thought they had been disposed of.
>
> THE COURT: Well, I was under the impression that they had been disposed of, too.
>
> MR. ALLEN: May I inquire as to whether or not the accused insists upon them?
>
> MR. RUFFIN: Not while I'm under the impression that they have been disposed of.
>
> THE COURT: All right, sir.

The state habeas court held that Ruffin's decision not to pursue the challenge at that point constituted a waiver of the claim, and the Georgia Supreme Court affirmed this holding. 255 S.E.2d at 3–4. The district court, however, refused to adopt this conclusion. After reviewing the dialogue between the court and attorney Ruffin, the district court concluded that "[w]hile Mr. Ruffin's rather cryptic statement might be read to imply a waiver, the statement seems to express, when taken at face value, the simple idea that counsel was not going to belabor a motion he felt had been ruled on." 538 F.Supp. at 95. The district court also heard testimony from Ruffin and concluded that his testimony "reinforces this point." *Id.* Despite these conclusions, the district court found it "unnecessary" to resolve the question of whether Ruffin had waived the claim because the court had already held that Spencer had not timely filed it. *Id.* at 96. In light of our conclusion that the challenge was timely, we agree with the district court that Ruffin's statements do not support the conclusion that the claim was waived. " '[I]ndulging every reasonable presumption against waiver' of fundamental constitutional rights," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), we conclude that a finding of waiver under these facts would be both illogical and clearly erroneous.[12]

### B. Analysis under *Wainwright v. Sykes*

Spencer argues that his procedural default also should be excused under the cause and prejudice analysis of *Wainwright*

---

before voir dire begins. However, the statute also contains a savings provision permitting a jury challenge "within seven days after the defendant discovered, or could have discovered, by the exercise of diligence, the grounds" for a challenge. 28 U.S.C.A. § 1867.

**12.** The third possible basis for procedural default addressed by the district court was that Spencer waived his jury challenge by failing to include it in his direct appeal to the Georgia Supreme Court. The federal district court accepted this basis without discussion, concluding only that it was "well supported by the evidence." 538 F.Supp. at 95. Although the Georgia Supreme Court on review of the state habeas court's decision noted that the failure to appeal the issue precluded Spencer from raising it in habeas, *see* 255 S.E.2d at 4 n. 3, the court cited no authority for the proposition that the Georgia habeas statute requires a direct appeal as a prerequisite for asserting a constitutional claim, and our review of Georgia law reveals no such requirement prior to the time of Spencer's state habeas petition. Thus, we would be inclined to conclude that this ground may also fit under the novelty doctrine. Moreover, the failure to appeal, even if clearly identified in Georgia law as a ground for procedural default, raises different considerations from those identified by the Supreme Court in *Francis* and *Sykes*. *See Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); *Wainwright v. Sykes,* 433 U.S. at 88 n. 12, 97 S.Ct. at 2507 n. 12; *id.* at 91–94, 97 S.Ct. at 2508–2510 (Burger, J., concurring). However, because the state does not pursue this issue in this appeal, we do not decide it. *See* note 5 *supra.*

*v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). In the district court, Spencer suggested his own ignorance of the law and the hostility of his lawyer to the pro se jury challenge as grounds for cause. The district court rejected this argument. 538 F.Supp. at 96–97 (citing *Tyler v. Phelps,* 643 F.2d 1095, 1101 (5th Cir.1981) (on rehearing), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1992, 72 L.Ed.2d 455 (1982), *Washington v. Estelle,* 648 F.2d 276 (5th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981) and *Lumpkin v. Ricketts,* 551 F.2d 680, 683 (5th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 316 (1977)). The court also held that Spencer's decision to represent himself for purposes of this motion is not adequate to establish cause, although the court did not "go so far as to label [Spencer's default] a purposeful relinquishment of the issue." 538 F.Supp. at 97. However, "the petitioner's silence on [his reasons for not pursuing his claim properly] is, at the least, a failure to uphold the burden placed on him by *Wainwright v. Sykes.*" *Id.*

Although the district court correctly concluded that ignorance and inadvertence cannot form the basis for cause under *Sykes,* Spencer offers an independent basis for excusing his failure to challenge the jury in accordance with Georgia's rule. To the extent that he has established to our satisfaction that Georgia courts had not prior to his case held that the second day of voir dire was too late to file a jury challenge, this fact would establish cause under *Sykes.* Certainly, a defendant should not be held accountable for his lack of awareness that the state court might at some future time interpret its procedural rules in some unanticipated way that results in a forfeiture of his federal claim. This is particularly true when, as in this case, Georgia law had not defined with any precision exactly when a jury challenge was to be forfeited. *Cf. Albuquerque v. Bara,* 628 F.2d 767, 776 (2d Cir.1980) (Brieant, J., concurring) ("*Wainwright* cannot be interpreted to grant states a blanket license to set up vague or unreasonable procedural obstacles to the assertion of a federal right.").

As grounds for prejudice, Spencer cites his statistical data tending to show underrepresentation of blacks and women on the jury lists in Burke County, arguing that they demonstrate disparities in excess of those found sufficient to set aside convictions in other cases. *Cf. e.g., Turner v. Fouche,* 396 U.S. 346, 359, 90 S.Ct. 532, 539, 24 L.Ed.2d 532 (1970); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Barrow v. State,* 239 Ga. 162, 236 S.E.2d 257 (1977).[13] Spencer also offers depositions of Burke County jury commissioners that tend to show a jury list selection system that is susceptible of abuse, *see Castenada v. Partida,* 430 U.S. 482, 494, 497, 97 S.Ct. 1272, 1280, 1281, 51 L.Ed.2d 498 (1977), and points to the federal district court's consent decree in *Sapp v. Rowland* based on findings of underrepresentation on the 1976 Burke County jury lists. *See* note 4 *supra.* Although the parameters of the "actual prejudice" standard of *Wainwright* and *Francis* remain unclear, *see Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), it cannot include a requirement that Spencer prove that he would have been acquitted or that he would not have received a death sentence had he been tried by a jury that was constitutionally composed. We note, however, that Spencer alleges that blacks and women are less likely to convict a defendant and recommend

---

**13.** Recently a panel of this Circuit suggested that under *Sykes* "an actual and substantial disadvantage—that which must be demonstrated on collateral attack—means something more than disparity in population percentages on a traverse jury list." *Birt v. Montgomery,* 709 F.2d 690, at 699 (11th Cir.1983). That opinion was vacated by an en banc vote of this Court. *Birt v. Montgomery,* 709 F.2d at 706 (August 19, 1983) (order for rehearing en banc); 11th Cir.R. 26(k). As we note in text, Spencer cites other evidence of prejudice.

the death penalty. *See Hovey v. Superior Court,* 28 Cal.3d 1, 616 P.2d 1301, 1337–41, 168 Cal.Rptr. 128, 164–168 (1980). It appears to us that Spencer has tendered the kind of evidence that a showing of "actual prejudice" requires.

If the only argument offered by Spencer in favor of the federal court's reaching the merits of his jury claim were the cause and prejudice element of *Sykes,* we would probably remand the prejudice inquiry to the district court in light of the fact that it did not rule on the issue. However, the district court need not reach the *Sykes* question in light of our holding in Part A *supra* that the novelty doctrine entitles Spencer to an evidentiary hearing on his jury claim as a matter of law. A holding under the novelty doctrine amounts to a conclusion that, for purposes of a federal court's review of a federal claim, there have in fact been no adequate grounds for procedural default. Thus, we need not and do not reach the question of whether the alleged default may be excused under *Sykes. See Wainwright v. Sykes,* 433 U.S. at 86–87, 97 S.Ct. at 2506–2507 (Court first decided threshold question of whether procedural default in state court was adequate before addressing cause and prejudice analysis); *Breest v. Perrin,* 655 F.2d 1, 2 n. 1 (1st Cir.) (same), *cert. denied,* 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 597 (1981).

## IV. THE *WITHERSPOON* CLAIM

During jury selection, the trial court excused venireperson Steve Kinnard for cause because he expressed opposition to the death penalty. Spencer argues that his dismissal was unconstitutional under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

█ In *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court recently reaffirmed that exclusion of a venireperson because of opposition to the death penalty is permitted only if the venireperson clearly indicates that he would always vote against the death penalty or that his opposition to the death penalty would impair his ability to discharge his duties as a juror:

> "[N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*"

*Id.* at 44, 100 S.Ct. at 2526 (quoting *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21) (emphasis in original). In the examination of venireperson Kinnard, the following occurred:

Q. Are you conscientiously opposed to capital punishment?

A. Yes.

Q. Now, Mr. Kinnard, would your reservations about capital punishment prevent you from making an impartial decision as to the defendant's guilt in this case?

A. It's quite possible.

Q. Your reservations about capital punishment, then, are such that you would never vote to impose the death penalty, is that correct to say?

A. I've never faced it, but I believe that would be true.

Q. That you would not under any circumstances vote the death penalty?

A. I believe so.

Q. Are your reservations about capital punishment such that you would refuse to even consider its imposition in the case before you under any circumstances?

A. Yes.

Spencer contends that Kinnard's responses did not demonstrate either that he would automatically vote against the death penalty or that his opposition to the death penalty would affect his ability to make an impartial decision as to guilt. Relying on *Granviel v. Estelle,* 655 F.2d 673, 677 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 1007, 102 S.Ct. 1636, 1644, 71 L.Ed.2d 870 (1982), he argues that Kinnard's second, third, and fourth responses were "far short" of the unequivocal statement of opposition necessary to permit exclusion. *See also Adams v. Texas,* 448 U.S. at 50, 100 S.Ct. at 2529.

■ Although Kinnard's initial responses by themselves do not suggest a clear and unambiguous statement of opposition, the district court correctly held that his response to the last question removed whatever ambiguity may have existed. By indicating that his reservations about the death penalty were such that he would "refuse to even consider its imposition in the case before [him] under any circumstances," Kinnard clearly affirmed that he would automatically vote against the death penalty "without regard to any evidence that might be developed." *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21. Spencer also contends that the court erred in failing to instruct Kinnard that, as a juror, it was his obligation to set aside his personal opinion. But in light of his unambiguous answer to the last question, the failure to give such an instruction could not have affected the determination of whether he should be excused.

■ Finally, Spencer raises the argument that he was denied his Sixth Amendment right to a representative jury from a fair cross-section of the community because those who opposed the death penalty were excluded. This argument has been rejected in this Circuit. *See Smith v. Balkcom,* 660 F.2d 573, 578 (5th Cir. Unit B 1981), *modified on other grounds,* 671 F.2d 858, *recalled temporarily,* 677 F.2d 20 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 593–96 (5th Cir.1978),

*cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

## V. THE *SANDSTROM* CLAIM

■ In its instruction to the jury, the trial court charged that "when the state's evidence shows the commission of a homicide by the accused by the use of a deadly weapon, the law presumes murder." Spencer contends that this instruction violated his rights under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and that the violation requires reversal of his conviction. In *Sandstrom,* the Supreme Court reversed a conviction where the trial court had instructed the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." The Court held that the instruction could be interpreted either as a conclusive presumption or as a burden shifting presumption, either of which violated the rule of *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), that the state must prove every element of an offense beyond a reasonable doubt. The district court held that the instruction at Spencer's trial fell within the proscription of *Sandstrom* because the jury could reasonably have construed the instruction as establishing a conclusive presumption of murder or as impermissibly shifting the burden of proof on the issue. 538 F.Supp. at 104. Upon a review of the court's instruction, we agree with this conclusion. As with the instruction in *Sandstrom,* the jury could have decided that the state did not have to prove malice or intent as an element of murder, *see* Ga.Code § 26–1101(a), thereby violating Spencer's rights under *In re Winship.*

■ The state argues that the trial judge informed the jury that each presumption he charged was rebuttable, and that the jury was charged that the state must prove every element of the crime beyond a reasonable doubt. But as the court below found, the first of these two instructions

"occurred at a different place in the charge than the instruction that the law presumes murder upon proof of a homicide committed with a deadly weapon," 538 F.Supp. at 104; indeed, the cure to which the state points occurred several pages after the defective instruction, and presumably referred to other presumptions on which the judge at that time was giving instructions. The state also asserts that the trial judge's instruction that the state must prove every element of the crime beyond a reasonable doubt removes the taint from the defective instruction. The Supreme Court specifically rejected this argument in *Sandstrom*, 442 U.S. at 518 n. 7, 99 S.Ct. at 2456 n. 7.

That the instruction at issue violates the rule of *Sandstrom v. Montana* does not end our inquiry. The district court held that, although the instruction violated *Sandstrom*, the error was harmless beyond a reasonable doubt because of "the overwhelming evidence in this case." 538 F.Supp. at 105. "[I]t is inconceivable," the court concluded, "that a jury would not have convicted James Lee Spencer of murder under Georgia law even if the faulty instructions were omitted." *Id.*

The law of this Circuit has been that a *Sandstrom* error may be held harmless beyond a reasonable doubt. *See, e.g., Lamb v. Jernigan*, 683 F.2d 1332, 1342 (11th Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983); *Mason v. Balkcom*, 669 F.2d 222, 227 (5th Cir. Unit B 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983). The United States Supreme Court recently addressed the question of whether a *Sandstrom* error could be held harmless beyond a reasonable doubt in *Connecticut v. Johnson*, —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), but the Court failed to command a majority for either view. Justice Blackmun, in a plurality opinion joined by three other Justices, concluded that, with few exceptions, a *Sandstrom* error should not be held harmless. Justice Stevens, however, who added the fifth vote to affirm the judgment of the Connecticut Supreme Court, did not join this opinion and instead concluded that the

appeal from the Connecticut Supreme Court decision did not present a federal question. —— U.S. at ——, 103 S.Ct. at 978 (Stevens, J., concurring in judgment). Thus, in the absence of a majority opinion by the Supreme Court holding that this Circuit's harmless error rule is incorrect, we remain bound by *Lamb* and *Mason*. Spencer urges that we create a special exception to this rule for death penalty cases, but this Court's language in *Mason*, which was a death penalty case, forecloses such an argument.

█ Upon a full review of the trial record in this case, we agree with the district court that the error in this case was harmless beyond a reasonable doubt. Although Spencer alleges that his state of mind was at issue in the trial, the absence of any credible evidence in support of his insanity, combined with the testimony concerning the circumstances of his planning and execution of the escape, convinces us that Spencer's constitutional rights were not violated by the instruction.

## VI. THE RIGHT TO AN EVIDENTIARY HEARING ON THE CONSTITUTIONALITY OF THE DEATH PENALTY

In his federal habeas petition, Spencer alleged that Georgia administers its death penalty statute in an arbitrary and discriminatory manner in violation of the Eighth and Fourteenth Amendments. Specifically, he contends that the penalty is imposed pursuant to a pattern and practice of discrimination, with a resulting disproportionate impact on blacks, taking into account the race of the defendant, the race of the victim, and the locality of the crime.

Spencer sought to challenge the constitutionality of the death penalty on direct appeal and again in the state habeas proceedings, alleging numerous grounds that included the allegations contained in his federal petition. The Georgia Supreme Court rejected his argument on legal grounds.

*See* 224 S.E.2d at 913. The state habeas court found against Spencer's claim on the merits as well, focusing principally on his contention, supported by testimony of various experts introduced at the state habeas hearing, that the death penalty is "morally wrong, and therefore, unjustified." Tattnall County Superior Court Findings of Fact and Conclusions of Law at 4, No. 77–75 (August 18, 1978). Citing precedent and evidence presented in other Georgia cases, the court also rejected Spencer's claim that the death penalty in Georgia was being administered in an arbitrary and discriminatory manner. Significantly, however, the court ruled against Spencer's request for appointment of experts and authorization of investigation into the administration of the statute. On appeal from the habeas court, the Georgia Supreme Court affirmed this ruling, holding that indigent defendants such as Spencer have "no right to receive or spend state funds for the appointment of experts or investigators in habeas corpus proceedings, even in death penalty cases." 255 S.E.2d at 4.

Between the time of Spencer's state habeas proceedings and the filing of his federal habeas petition, Dr. David Baldus, a statistician and social scientist who had previously studied the question of the administration of death penalty statutes,[14] independently conducted a complex scientific study of the administration of Georgia's death penalty, focusing on the issues raised in Spencer's federal habeas petition. When Spencer, along with petitioners Ross and Mitchell, sought to introduce Dr. Baldus's data at an evidentiary hearing, the district court ruled that the petitioners were not entitled to an evidentiary hearing to challenge the constitutionality of the Georgia death penalty statute as applied. The district court reviewed the "various findings of fact made by the Georgia Supreme Court and the superior courts hearing the state post-conviction petitions," 538 F.Supp. at 88, and concluded that these findings should

be accorded a presumption of correctness in federal district court. The court reached this conclusion after deciding that none of the factors listed in 28 U.S.C.A. § 2254(d) (which establish when state findings should not be accorded a presumption of correctness) exist in Spencer's case. The court also concluded that the state courts' findings against Spencer "are fairly supported by the evidence." 538 F.Supp. at 88. On these grounds, the court reasoned that there was a presumption against holding an evidentiary hearing, and that it was "the responsibility of the petitioners to make an offer of proof which could override this presumption before a full evidentiary hearing would be necessitated." *Id.*

■ We note at the outset that we disagree with the district court's methodology for determining whether the petitioners were entitled to an evidentiary hearing. Section 2254(d) does not control when a federal court should hold an evidentiary hearing; it affects only the presumption of correctness to be applied to the state's findings of fact in the event that the federal court does hold a hearing. For deciding whether to hold an evidentiary hearing, this Court in *Thomas v. Zant,* 697 F.2d 977, 983–85 (11th Cir.1983), recently directed district courts to look to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), which focused on whether petitioners had deliberately bypassed state remedies in determining whether they were entitled to evidentiary hearings in federal district court. Concluding that *Wainwright v. Sykes* and similar recent cases in the Supreme Court did not alter the *Townsend* standard in the context of whether an evidentiary hearing should be held, *see* 697 F.2d at 982, the *Thomas* court set out a new test with two elements for determining when an evidentiary hearing is required:

first, that a fact pertaining to his federal constitutional claim was not adequately developed at the state court hearing and

---

**14.** *See, e.g.,* Baldus, Pulaski, Woodworth & Kyle, *Identifying Comparatively Excessive Sen-* *tences of Death: A Quantitative Approach,* 33 Stan.L.Rev. 1 (1980).

that the fact was "material" ...: and second, that failure to develop that material fact at the state proceeding was not attributable to petitioner's inexcusable neglect or deliberate bypass.

697 F.2d at 986. Thus, *Thomas* confirms that the presence or absence of any of the factors listed in Section 2254(d) is not determinative of whether an evidentiary hearing is required, or of whether there should be a "presumption" for or against such a hearing. Instead, the question of whether a petitioner is entitled to federal evidentiary hearings turns on whether the record suggests the presence of these two elements. The *Thomas* court also suggested that, if the record does not clearly resolve the question, the court should hold preliminary evidentiary hearings. *Id.* Such hearings would be somewhat analogous to the cause and prejudice hearings that district courts now sometimes hold under *Wainwright v. Sykes.*

In addition to applying the incorrect standard for determining when an evidentiary hearing is required, the district court also erred in its reasoning as to why the petitioners had not met its "presumption" against conducting the hearing. The district court relied on two reasons. First, *Spinkellink v. Wainwright,* 578 F.2d 582, 604–05 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), "severely limits the type of evidence which would be relevant" because the Georgia death penalty had been conclusively presumed constitutional. 538 F.Supp. at 88. Second, the petitioners came to the district court "prepared to present the same or similar evidence they claimed they could not present at the state level, and do this despite the denial of a similar request for money in this Court.... While the issue need not be reviewed in detail in light of the conclusions mandated by the *Spinkellink* case, the Court will note the fact of petitioner's [sic] ability to present evidence here when faced with the same purported lack of funds they faced during state proceedings casts the failure to present that evidence in the courts of Georgia in the light of strategic default." *Id.* at 88–89 (footnote omitted).

█ Dealing with the court's second reason first, any suggestion of strategic default is flatly contradicted by the fact that Dr. Baldus had not begun even to gather his data until after Spencer's state habeas proceedings had run their course. Even if Spencer had obtained financial assistance to undertake a study of the death penalty, it seems unlikely that he would have obtained Dr. Baldus's assistance, as Dr. Baldus conducted his study independent of Spencer. Other than his failure to obtain Dr. Baldus's data at an earlier time, the district court pointed to no other evidence to suggest deliberate bypass. The district court acknowledged as much in its discussion. 538 F.Supp. at 89 n. 10. Therefore, we conclude that the record does not support a finding of deliberate bypass.

The district court's first reason for denying an evidentiary hearing—that *Spinkellink v. Wainwright* precludes it as a matter of law by establishing a conclusive presumption as to the death penalty's constitutionality—requires more detailed analysis. In *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858, *recalled temporarily,* 677 F.2d 20 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), this Court described the effect of *Spinkellink* on claims such as that presented by Spencer as follows:

In *Spinkellink* this court observed "that if a state follows a properly drawn statute in imposing the death penalty, then the arbitrariness and capriciousness—and therefore the racial discrimination—condemned in *Furman* [*Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346] have been conclusively removed." *Spinkellink v. Wainwright,* 578 F.2d 582, 613–14 (5th Cir.1978) (footnotes omitted). Smith construes *Spinkellink* as precluding constitutional challenges to the *application* of a death penalty statute and argues that *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), overrules *Spinkellink* on this point.

*Spinkellink,* however, effected no such broad prohibition. It merely established that in the absence of proof of "some specific act or acts evidencing intentional or purposeful ... discrimination against [the petitioner]" on the basis of race, sex, or wealth, a petitioner is not entitled to relief on habeas corpus.

660 F.2d at 584–85 (footnote omitted). Thus, *Spinkellink* and *Smith,* rather than precluding all attacks on the constitutionality of the death penalty, establish that the merits of an attack on its constitutionality as applied turn on the quality of the evidence presented. The same *Smith* opinion also suggested what it considered to be adequate evidence when it discussed Smith's evidence. After describing Smith's claim as "brimming with 'mere conclusory allegations,' of discrimination," and "wanting in proof of intentional discrimination against him in this particular case," 660 F.2d at 585, the court turned to the evidence supporting his equal protection claim:

The equal protection aspect of Smith's attack on the constitutionality of the application of Georgia's death penalty suffers from a similar deficiency. Smith has adduced evidence that "racial factors [are] evident in Georgia capital sentencing patterns." Brief for Petitioner-Appellant at 40. Even if this evidence were sufficient to prove a racially disproportionate impact—and we do not decide that it is—such evidence alone cannot establish an equal protection violation. To trigger strict scrutiny of a statute, proof of intentional or purposeful discrimination is necessary. *Washington v. Davis,* 426 U.S. 229, 265, 96 S.Ct. 2040, 2059, 48 L.Ed.2d 597 (1976); *Spinkellink v. Wainwright,* 578 F.2d 582, 615 (5th Cir.1978). Without such proof,[33] any discriminatory impact may be explained on nonracial grounds. *Spinkellink v. Wainwright,* 578 F.2d at 615.

*Id.* The district court in this case, reviewing Spencer's and his co-petitioners' allegations in support of their request for an evidentiary hearing, noted that the allegations, if proved, would show "glaring disparities in the imposition of the death penalty based upon race, sex, and poverty." 538 F.Supp. at 90. After suggesting that their allegations "may be true," the court went on to state that "if so, [it] would be sad and distressing," but "this allegation does not alone show any infirmity in a statute otherwise found to be acceptable under the Constitution. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Spinkellink, supra,* 612–616." *Id.*

Ten days after this opinion by the district court, the *Smith* panel published a modification of its original opinion which more clearly established what had been implicit in *Spinkellink* and the original *Smith* opinion: that while statistics alone usually cannot establish intentional discrimination, under certain limited circumstances they might. The *Smith* panel substituted the language concerning the quality of Smith's evidence with the following paragraph that more clearly suggested this point:

In some instances, circumstantial or statistical evidence of racially disproportionate impact may be so strong that the results permit no other inference but that they are the product of a racially discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 [97 S.Ct. 555, 266, 50 L.Ed.2d 450] (1977); *see Furman v. Georgia,* 408 U.S. 238, 389 n. 12 [92 S.Ct. 2726, 2804 n. 12, 33 L.Ed.2d 346] (1972) (Burger, C.J., dissenting).

*Smith v. Balkcom,* 671 F.2d 858, 859 (5th Cir. Unit B 1982). *See also Adams v. Wainwright,* 709 F.2d 1443, 1448–50 (11th Cir. 1983). The *Smith* court then went on to suggest, as it had before, that Smith's evidence was completely inadequate to establish a finding of intentional discrimination. *Id.* at 859–60 & n. 33. Apparently partly in response to the modified *Smith* opinion, the district court in this case issued a modified opinion that tipped its hat to the new *Smith* language. In fact, however, the district court did not pick up on the *Smith* panel's more clearly pronounced statement that statistical allegations of discrimination are not insufficient per se in claims such as

these.[15] For example, although the court acknowledged that statistical evidence alone might establish a case of discrimination, it immediately went on to state that Spencer's evidence was defective because it alleged no intentional acts of discrimination. The court also rejected the Baldus evidence out of hand, concluding that like Smith's evidence it left "untouched countless racially neutral variables." However, without the benefit of an evidentiary hearing, it seems unlikely that the district court could have adequately analyzed the Baldus evidence insofar as it was not then available except by live testimony. Moreover, the modified *Smith* opinion indicated for the first time the defects in Smith's data in some detail:

> Appellant's statistician sought to determine the total number of incidents involving homicide reported as having taken place in Georgia by a somewhat arbitrary (but accepted as statistically correct) adjustment for unreported incidents. He used Supplemental Homicide Reports (SHRs) submitted by Georgia law enforcement officers to the Federal Bureau of Investigation. (He compiled a supplemental data base of those homicides associated with the commission of some other felony—one, but only one, of the aggravating circumstances under the statute. *See* note 7 *supra*). The study then compares these reported incidents with death penalties ultimately imposed, after trial, in the state. No data is offered as to whether or not charges or indictments grew out of reported incidents or as to whether charges were for murder under aggravating circumstances, murder in which no aggravating circumstances were alleged, voluntary manslaughter, involuntary manslaughter, or other offenses. The data are not refined to select incidents in which mitigating circumstances were advanced or found or those cases in which evidence of aggravating circumstances was sufficient to warrant submission of the death penalty *vel non* to a jury. No incidents resulting in not guilty verdicts were removed from the data. The unsupported assumption is that all such variables were equally distributed, racially, sexually, offender and victim, throughout the SHRs. No conclusions of evidentiary value can be predicated upon such unsupported assumptions. *Spinkellink v. Wainwright*, 578 F.2d 582, 612–16 (5th Cir.1978).

*Smith v. Balkcom*, 671 F.2d at 860 n. 33. In the absence of any specific findings by the district court and without any opportunity given to the petitioners to present their evidence, we conclude that the district court did not adequately analyze the data. In his brief to this Court, Spencer alleges that Dr. Baldus's study addressed the very defects identified in the evidence in the above-quoted *Smith* footnote. The merits of this allegation cannot be assessed without a more detailed consideration of the evidence proffered by the petitioners below.

Since the district court applied an incorrect standard for deciding whether to hold an evidentiary hearing and wrongly decided that statistical evidence cannot form the basis for an attack on the Georgia death penalty statute as applied, we hold on the record before us that Spencer is entitled to an evidentiary hearing on the merits of the

---

15. A comparison of the paragraph substituted in the modified *Smith* opinion reveals that, in addition to the changes mentioned above, the court also substituted *Village of Arlington Heights* for *Washington v. Davis* as support for the proposition that statistical evidence alone may be enough. As the court put it in *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564, "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *See also Castenada v. Partida*, 430 U.S. 482, 493, 97 S.Ct. 1272, 1279, 51 L.Ed.2d 498 (1977); *Adams v. Wainwright*, 709 F.2d 1443, 1449–50 (11th Cir.1983) ("Only if evidence of disparate impact is so strong that the only permissible inference is one of intentional discrimination [in the administration of the death penalty] will it alone suffice. *See Smith v. Balkcom*, 671 F.2d 858, 859 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982)."). The district court, in its modified opinion in response to the modified *Smith* opinion, retained its citation to *Washington v. Davis* and did not cite *Village of Arlington Heights*.

claim as a matter of law. The data proffered in the district court clearly were not adequately developed in the state court and are material to Spencer's allegations. Moreover, the district court has already found an absence of any evidence in the record supporting deliberate bypass. 538 F.Supp. at 89 n. 10.[16]

## VII. CONCLUSION

For the reasons stated above, we agree with the district court's disposition of Spencer's challenge to the jury instruction at his special plea hearing, his *Sandstrom* claim, and his *Witherspoon* claim. As to Spencer's jury challenge and his challenge to the constitutionality of the death penalty as applied, however, we VACATE the judgment of the district court and REMAND these two claims to the district court for further evidentiary hearings. The district court shall conduct evidentiary hearings on the merits of Spencer's jury claim and on his challenge to the death penalty statute.

LYNNE, District Judge, specially concurring.

I concur in the judgment of the Court remanding appellant's challenge to the death penalty statute for further consideration by the district court and in all but part III of the opinion.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this case reheard en banc,

IT IS ORDERED that the case shall be reheard by this Court en banc *with* oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.

16. Spencer also asks us to decide that the state findings of fact that bear on the issues presented in this claim should not be accorded a presumption of correctness under 28 U.S.C.A. § 2254. Specifically, he contends that he was not afforded a full and fair opportunity to present his evidence and that the material facts surrounding his claim were not adequately developed. For these reasons, he suggests that his claim falls within the exceptions provided in § 2254(d)(2), (3), and (7). We do not address this issue, concluding that the district court is better suited to do so. In light of the fact that our review of the state courts' opinions involving Spencer reveals mostly conclusory findings as to the constitutionality of the death penalty statute, the district court should, in addition to analyzing Spencer's argument as to the applicability of the exceptions enumerated in § 2254(d), determine which, if any, specific state findings are even eligible for a presumption of correctness.